Okay, it appears that everyone is present for the next case so we will begin now argument, and I apologize if I mispronounce this, but we're ready for Wachos, is that correct, versus Tesla. And we have Mr. Goldberg and Mr. Christy. So with that, you may begin. May it please the Court, Jacob Goldberg on behalf of Plaintiff Appellants Srinivasan and Friedman, I'll reserve three minutes. Fundamentally, this case is about whether district courts must adhere to the precedence of this court, and secondarily, whether they must apply the standard that the Supreme Court and this court have set for evaluating motions to dismiss. As a matter of substance, the district court ignored this court's well-established TSLRA safe harbor jurisprudence, improperly finding that the statements at issue were forward-looking and entitled to safe harbor jurisprudence. I appreciate both counsel focusing on the August 2nd, 2017 representation that the, quote, machine that makes the machine was producing automobiles when in fact they were still being done by hand. So, Your Honor, this comes to, this gets to how the district court drew inferences in the case. The record in this case is replete with instances where the defendants discussed a plan and a schedule and the timing for those benchmarks. The company first said in the first quarter Form 10-Q that we have a plan to produce the Model 3, and our assumptions, our key assumptions, involved first building and equipping, again, building and equipping a line, a new assembly line, and that assembly line is the machine that makes the machine. Where does it say that? Where was the statement defined as that? This is what I mean by machine and machine. Sure, so, Your Honor, they don't ever say, they don't ever explain the phrase machine that makes the machine, but in context, as this court ruled in 1989 in Casella v. Webb, context is key. The assembly line is the machine that makes the machine, and the counter, the counter inference is that production meant production by hand, and there is simply nothing in the record that's... Wait a minute, where is production defined as production by hand? Where in the record is that defined? It's not, Your Honor, but the record is... We have to decide that, but there's no definition of it. Well, so, Your Honor... Did anybody ask a question? I would think all these investors... No one raises the question of what you really mean. It was never discussed, and so now we have to decide what it, what could possibly be the meaning of this. I'm frank to admit, and I can be talked out of this, but after I read Judge Breyer's opinion, he was pretty persuasive to me. Of course, he's a very good district judge. He's a tough guy to get around when he makes the decision, but I'd like to have you focus on where Judge Breyer was wrong, because it looked pretty good to me. So, Judge Wallace, Judge Breyer found that we had not pleaded that defendants ever expressed a plan, that Tesla never said, this is what our plan is, that this is forward-looking, because essentially, everything is subsumed in the goal of mass production by the end of 2017, but I refer you to the record S.E.R. 166, which is the first quarter 10-Q in May of 2017, and in that, Judge Wallace, the defendants confirm that they had a production plan and a time-off, and what they said, and now I'm quoting is, the production plan for Model 3 is based on any key assumption, the first of which is complete building and equipping a new, dedicated, final assembly line for high-volume production of Model 3 at the Tesla factory on our projected timeline. Now, what they have said, Your Honor, is production begins and must begin in July. And everything you just read, everything you just read sounds forward-looking, and the statement of a goal is inherently forward-looking, and if you just express this is the goal, this is what we hope to accomplish, how is that not forward-looking? Right, so the goal, Judge Collins, is certainly forward-looking. We would like to build and to equip this to completion so that we can start production, but you'll recall that what's false and misleading about May is, and there is no dispute that we have treated this with requisite particularity, that in May, Judge Collins, they had not yet begun installing the equipment, even as they said affirmatively, we have begun installing. So if you look at that statement, what we'll determine is that ultimately, in May, they were saying we started this and it's going to take us four to five months to finish it. We're going to finish it in July, or in late June. They then, in July, in August, in the update, they said we finished this. In June, we put the final touches on this Where's the false statement in May as to what the facts, the contemporary facts in May were that you contend was false? Sure. As opposed to the goal. Your Honor, in May, the defendant said we started installation of the equipment, the machine to make the machine, at our Fremont facility. We started that in early February, and they in fact had not started that, we plead, with requisite particularity, until late April or early May. Therefore, Your Honor, I'd like to, with my colleague's permission, switch gears a little bit to another issue that's of concern to me. Even assuming that some or all of the statements are otherwise actionable, would you discuss loss causation, which seems tenuous to me, just looking at the at the allegations? Without knowing the your concern, Your Honor, at the time of the the partial disclosure in October, that things were not as Tesla had described, the stock price fell. Again, in November... Well, it went up and then it went down, and it's, to me, it's unclear as to whether it's related to these disclosures, or related to other market conditions, or related to earnings projections, or, I mean, you say that it's closed the facts, but why is that sufficiently plausible in the context of a non-dramatic drop that also, there seems to be an ebb and flow in the stock price, at least as I understood it. But the ebb and flow is not explained away by the drop on the dates of the disclosures, Your Honor, and even as the PSLRA requires a more precise pleading for loss causation, in this case, there is no intervening cause on the dates of disclosure. There's nothing of record which would cause the court at the pleading stage to determine, as a matter of law, that the complaint fails to plead loss causation. The stock price fell in response to what was, as we've pleaded, Judge Graber, existential to Tesla. They needed to get to the end, to mass production, and if they failed to get to mass production, that required them to spend enormous sums of cash, which might have required them to go back to the market and seek more. That's all a tremendous risk. So when they disclosed, when the Wall Street Journal disclosed in October that they were engaged in what one automotive expert said was horse and carriage production, when they disclosed that, the stock price fell because the risk increased that they would fail to reach the goal. Then, in November, when they themselves conceded that they would not reach the goal, the stock price fell again. Mr. Graber had the opportunity at class certification and at trial to prove, A, that there was no price impact, and B, that there was some supervening or intervening cause that severs the relationship between the disclosure and the drop. But at the pleading stage with Judge Graber, that's not an issue. If I may just quickly return to the first quarter, Judge Collins, they say, here's our production plan and we have to complete and build, and you're correct, Judge Collins, that is in itself forward-looking. But what they failed to disclose in May is that they had not yet begun installing, which means that if installation takes four to five months, there are four to five months from May, which puts them into October to begin the production ramp. And if they don't begin the production ramp in October by their own schedule, Judge Collins, they will fail to reach mass production by the end of 2017. And then, if you look, and this is very important, if you look at SER204, which is the second quarter 10-Q, again, Judge Collins, they say, here's our plan and here's our timing. But now, gone from that, after the defendants had said, here's the machine that makes the machine, we've completed it and now we're producing, gone from that, Judge Collins, is we are building and we are equipping the facility. Replaced by, we will, the key assumption being, we will be able to complete implementing and ramping a new final dedicated assembly line. So they've transmogrified what you correctly identified as forward-looking in May to something that they had completed. And in the update and in the conference call, they do nothing to disabuse the market of the fact they had said they completed the machine that makes the machine. And they're still here... Ansel, you're eating into your rebuttal time, which you're entitled to do, but you won't have it left if you continue, so... I understand, thank you, Your Honor, but I think that this is a very important point because what goes from being a forward-looking statement in May becomes something that they state with certainty. The machine that makes the machine is finished and therefore we have begun production. And the complaint pleads with requisite particularity that Judge... I beg your pardon, the complaint pleads with requisite particularity that in fact they did not make any cars on the machine that makes the machine at least through the middle of October of 2017. And if they failed to push the button, all the risk disclosures that Mr. Christie is about to tell you about, they don't make a difference because they have not yet started production. Thank you very much. Thank you. You will have a little bit of rebuttal time remaining. And Mr. Christie, it's your next step. Thank you, Your Honors, and may it please the court. I thought it might be helpful at the outset to provide a little context by briefly covering the timeline because I think it really helps frame the issues for the court and shows why Judge Breyer got this exactly right. So just to get this straight, in May of 2017, two months before production of the brand-new Model 3 even began, Tesla said it was expected to ramp manufacturing to a run rate of 5,000 vehicles per week by the end of the year. And in August of 2017, just a couple days after production began, it provided the same guidance. And then what happened is in mid-September, it ran into some bottlenecks at part of its manufacturing facilities. The module line for batteries at the Gigafactory, it disclosed that problem promptly on November 1st, and at that time it revised its forward-looking guidance to defer this goal, the 5,000-unit goal, into 2018. So basically... Can I ask you, I want to focus on this second quarter update. Sure. And in particular, the two highlighted sentences that are on page 118 of the excerpts of record. You know, one says during quarter two, our engineering, manufacturing, and supply chain teams were focused on the final stages of Model 3 product development and building the machine that makes the machine for the start of production. And then three paragraphs down, it says, having started production of Model 3 on schedule in July. Isn't it the inescapable inference of those two sentences that the machine that makes the machine had been completed to permit the start of production in July? No, not at all, Your Honor, and let me address that in some level of details. But let me start with one really basic point, that in three pleadings in this case, including the second amended complaint that runs 80 pages and 314 paragraphs, the plaintiff doesn't reference this statement a single time. It's not pleaded anywhere. So they're arguing that Judge Breyer committed reversible error based on an allegation it did not make, and an argument it did not make, through two motions to dismiss at the district court level. That's a little too little too late. But there's importantly, even if they had, there's a reason why they didn't refer to that statement, because they're really taking it completely out of context. The final stages reference at page 176 in the record, the final stages reference is to product development. What we're saying is, we're just finishing developing the product, and it says the teams are focused on building the machine that makes the machine for the start of production. Now, of course, they were focused in part on building the machine that makes the machine for the start of production. That's what everybody would expect them to do. But you can't read, you have to read the sentences and all the disclosures in context. You can't read that to mean that all manufacturing automation was already in place, especially because at the very same time, Tesla said it still needed to, quote, complete the implementation, complete the implementation and ramp of automated manufacturing equipment and processes. It still needed to add production lines and capacity in order to meet its goals. It said it was still working on it. And indeed, in the August 2nd conference call, they actually said they were still ordering equipment for the, the monthly. So, it's fanciful for the plaintiffs to now allege, well, that means all manufacturing must have been automated at that time. It's simply inconsistent with Tesla's contemporaneous disclosures, which were briefed extensively twice before Judge Breyer, and in the district court, as well as in their appellate briefs here, the two briefs they filed. They don't address those disclosures a single time. That's pretty telling because that's the context in which they should be read. Now, Mr. Goldberg also made the assertion, you know, that they. But I still don't, the problem I still have, if it says that they were working on building the machine that builds the machine for the start of production, and then you say, and we started production, any reasonable investor who looks at that would think that that means that the machine that makes the machine had been completed. Doesn't necessarily mean there aren't other things to be done, but that had been done at some level, which appears from what they pleaded to have been false. There was no machine that makes, they weren't making anything at an automated level. Well, but that's not true either, Your Honor. If you look at, for example, the May shareholder letter, the May shareholder letter describes processes that are automated that were already in place. It talks about the Schuller press line, the paint shop, for example, and that's in the record at SER 140. What Antesla had regularly talked about, the machine that makes the machine, to refer to its overall processes. So some were in place, but when you read the other disclosures, which the plaintiff would be writing out of existence saying, we still have to implement and ramp additional manufacturing, additional automated manufacturing to make our year-end goal, those statements become meaningless if the allegation is interpreted that way. And that's the fundamental problem that the plaintiff has. And I would add, Your Honor, that, you know, the plaintiff sometimes argues that the market understood this to be the way Tesla's timeline. But when you look at the only analyst reports, for example, that they have in this case, none of them talk about this 11-month plan or say automated production would begin in July. To the contrary, they say that Tesla didn't reveal any new data points, and they never make reference to this 11-month plan. But let me take it back to, to what the statements are that the plaintiff is claiming or misleading here, because their allegation is, in the case, isn't about that statement, which isn't even referenced in their complaint, was false. The statements that they are referencing as being on false, in May, they're statements that say that preparations at our production facilities are on track to support the ramp of Model 3 production to 5,000 by year-end. That's the alleged misstatement. And as to that statement, the plaintiff doesn't have any witness or on May 3 when you spoke, and you were off that plan. Instead, their entire case hinges on eight words at page 30 of Tesla's May 10 cue. And that statement simply was that Tesla had started the installation of Model 3 manufacturing equipment. That's all it said. Didn't say anything about automation, didn't say when it would be done, didn't say anything at all. It doesn't have this that the plaintiff alleges. And that's why Judge Breyer looked at the statement, looked at the context in which it was made, and he said it was entirely specious. This plan doesn't exist. It's not what Tesla said, and it's not a reasonable inference to be drawn from what Tesla said. You're, this is where we get down to the on track language. And on track, on track has a meaning in and of itself. We haven't, in our circuit, done much with that language. The Third Circuit has. And we've cited the Third Circuit case in, on the on track language as proving it. Is there anything we've done or do we need to do about this on track language? On track has a meaning of its own. Ordinarily, it means things are going as we anticipated. Feel free, rest assured. Third Circuit didn't agree with that language. And then in quality systems, we, we approved the language. How does that on track language now? Have we gone far enough from quality systems or, or is there still a gap as far as what on track means? I think, Your Honor, it's a very interesting issue. I think in one measure, you don't really have to reach the quality systems issue because Judge Breyer was right when he didn't find falsity. So whether it's, it's a mixed statement or forward looking doesn't make a difference unless you at first find falsity. That said, quality systems didn't deal with on track language per se. What, what quality systems was concerned about was a defendant's effort to transform a present state statement into a forward looking one by combining it with a projection. And so in that case, for example, it was the plaintiff, the defendant saying, here is the state of my pipeline. My pipeline is good. And it then makes, sometimes it said that independently, sometimes it combined it with a projection. And what the court said was, well, no, you've got a three high level people who say that was false at the time. And you can't protect that portion that talked about your existing pipeline into a forward looking statement just by combining it that way. But in doing that, quality systems did cite with approval, as your honor was pointing out, the third circuit case, which is the Avaya case. And the Avaya case said that it held an on track statement, was forward looking. And it said when you read it in context, the statement cannot meaningfully be distinguished from the future projection of which it was a part. And that's exactly, and remember, quality systems doesn't have on track language. That's exactly our case. Our case says, the statements are, preparations are on track to support the ramp to 5,000. The track is to support the ramp to 5,000. That has no independent meaning, independent of the projected goal. And that's why both courts before quality system and since quality systems, and we cite an array of them in our briefs. They say, no, those are forward looking. Now there can be circumstances where they're not, but the cases are a little bit divided. But I think it's really a case by case basis, Judge Wallace, in a long answer to your question. I don't know that there's an easy way to pronounce a rule that says on track is always a mixed or on track is always forward looking. I think as quality systems itself points out, it depends on the context and on the particular circumstance. My concern, of course, is that we have district courts that are going both ways on the on track language. And whether that needs to be clarified in this case or some other case was a concern to me. But thank you for your answer. Thank you. Thank you, Your Honor. If I might, Your Honor, let me address this allegation or the statement that plaintiff's counsel made that we weren't installing equipment as of May. He said that that was a false statement when we said we were installing equipment. Again, the statement being we have started the installation of Model 3 manufacturing equipment. Plaintiff has no witness, no document, no anything that says that that isn't absolutely true. And indeed, the only witness that incites, that even talks about automated equipment, put aside any equipment, is FE7, former employee number seven. And that's what they hang much of their hat on in this case. And the problem with FE7 is that he's not much of an eyewitness. He was a temporary employee who was employed in Fremont before production even began. He was there from February until June. He worked in the pilot shop in Fremont. He doesn't know what was happening at the Gigafactory. He doesn't know what was happening at the main factory in Fremont. And he doesn't purport to know the plan. But one thing he does say, and it goes to the assertion that no equipment was being installed, is he said even automated equipment was being installed in April. So obviously there was some equipment being installed before that as well. So the notion that Tesla misrepresented that in its 10Q just doesn't have any support in the complaint or in any of the other allegations. Lastly, your honor, I guess I would address Judge Graber's points about loss causation. And I don't think you have to necessarily reach loss causation in order to affirm because of the falsity, but it really is lacking here. The plaintiff alleged three corrective disclosures in the case. One followed that October 2 release that I referenced where we announced the bottlenecks. They kind of abandoned that claim because the price went up after that disclosure, not down. Their next allegation concerned this October 6th Wall Street Journal story. And putting aside for a minute that it too conflates automated production with the stock price declined for just a day and then bounced back to the same or even higher levels. So it can hardly be said to have revealed some fundamental fraud at Tesla when the stock price goes back up. And that's what happened in the Metzler case, where the Ninth Circuit said, hey, if the stock price bounces back that quickly, in that case it was a three-day period, that isn't sufficient to assert a loss causation. And that makes perfect sense. And finally, Your Honors, as to the last alleged corrective disclosure is the November 1 decision of Tesla to revise its guidance. That may be new information, but it's not a corrective disclosure of anything that they assailed here. And I see my time is up. Yes, thank you very much. And you have some rebuttal time remaining. I do, thank you very much, Judge Graber. Judge Wallen. Can you tell me what's your response to the point that you didn't raise the statement that I quoted from ER 118 is not actually in the complaint? I'm looking at paragraph 258, which references that document and only quotes a sentence on the second page and doesn't have the one that I mentioned. Is that an unpleaded claim? It's not, because Mr. Musk references the machine that makes the machine during the conference call, and that is in the complaint. So again, Judge Collins, if we take context, referring to the machine that makes the machine in the update is subsumed in the allegation and fundamentally the allegation that the company states, based on our preparedness, our goal, our projection of mass production by year's end remains. And that was simply not true, because the machine that makes the machine, the building and the equipping, was not done and wasn't done until October. We never pleaded, Judge Collins, as Mr. Christie says, that all systems must be automated, but the machine that makes the machine is an assembly line. There may be a machine that makes the machine is completed and building and equipping is finished. Their own schedule, this is their schedule, it's in the form 10-Q. It goes from being forward-looking building and equipping to having finished building and equipping in August. They were not producing the car, they were making it by hand, and each of the investors, you look at the May 2nd, the 3rd conference call, I investors know that Tesla can make the car by hand without the machine that makes the machine. The question is when they're going to be able to ramp to mass production so that their cash burn stops. That's what's critical here. Now, Judge Wallace, we are confident that we will make our projection because our pipeline is good. That's quality systems. Here, they say, we are confident we will mass produce because of our preparedness. There's no daylight between those two statements, and therefore, their statements, on track or otherwise, in this context, are absolutely not forward-looking, even as the goal was. Thank you, counsel. The case just argued is submitted, and we appreciate very interesting case. And with that, we will take another five-minute break between this case and the next one. Thank you. Thank you, Your Honor. Thank you.
judges: Wallace, Graber, Collins